Filed 4/20/21  In re N.M. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re N.M., a Person Coming Under the Juvenile Court Law. | |
| TULARE COUNTY HEALTH AND HUMAN SERVICES AGENCY, Plaintiff and Respondent, v. ROSE M., Defendant and Appellant. | F082081 (Super. Ct. No. JJV059428) **OPINION** |

### THE COURT[*]

APPEAL from an order of the Superior Court of Tulare County.  Hugo J. Loza, Commissioner.

Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant.

Jennifer M. Flores, County Counsel, John A. Rozum and Amy-Marie Costa, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Levy, Acting P.J., Meehan, J. and De Santos, J.

In this juvenile dependency case, Rose M. (mother) appeals the juvenile court's order terminating her parental rights as to her minor child, N.M. (Welf. & Inst. Code,[1] § 366.26). Mother contends the order must be reversed because the court erred by failing to apply the beneficial parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)).[2] Finding no error, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2019, dependency jurisdiction was taken over then six-year-old N.M. under section 300, subdivisions (b)(1) (failure to protect) and (j) (abuse of siblings) due to mother's substance abuse, instability in providing housing for N.M., mental health issues, and previous dependency proceedings arising from similar issues with N.M.'s sibling. N.M. was ordered removed from mother's physical custody, and mother was ordered to participate in family reunification services, including mental health counseling, parenting classes, and substance abuse services.

Over the course of the reunification period, mother was inconsistent with her participation in services and random drug testing. When she did drug test, she tested positive for illegal substances except for a brief period when she was incarcerated from approximately January 2020 through March 2020. Mother, however, was consistent with visits with N.M. Visits commonly consisted of mother and N.M. playing games and talking. N.M. and mother showed affection to one another by holding each other and giving each other hugs and kisses. At the end of visits, N.M. often became emotional, and after visits, she would display anger toward her care providers.

As part of her case plan, N.M. participated in therapy and was diagnosed with adjustment disorder with anxious mood. N.M. consistently expressed worry about

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] The identity of N.M.'s father was unknown throughout the duration of the proceedings, and is not a party to this appeal.

2.

mother, such as whether mother was homeless or getting enough to eat. N.M. also consistently expressed that she missed mother and she desired to return to mother's care. N.M.'s therapist was working with her to help her reinforce healthy boundaries between N.M. and mother and process her feelings about being in placement.

While mother was incarcerated from January 2020 to March 2020, visits between mother and N.M. ceased, and N.M.'s behavior improved. The care providers reported N.M. was more focused on playing with the other child in their home, talked less about mother as she was less anxious and worried, stopped displaying anger toward the care providers, and was doing better in school both academically and behaviorally. N.M.'s teacher reported N.M. had often cried at school because she was worried about mother, but since the visits had ceased, N.M. appeared less anxious, more at ease, and more focused in class. N.M.'s therapist reported N.M.'s negative behaviors were decreasing as she adjusted to placement. N.M.'s therapist explained N.M. experienced grief due to being separated from mother and frustration and anger due to mother's inability to follow through with case plan services for reunification.

When mother was released from custody in March 2020, N.M. and mother's visits were conducted over the telephone due to precautions related to the COVID-19 pandemic. N.M. adapted well to only having telephone contact with mother. Her behaviors continued to improve, and her worry and stress about mother continued to decrease.

N.M. spent the entirety of the proceedings with the care providers with whom she was placed at the outset of the case. N.M. liked her care providers and felt safe. She sought comfort from them and, by the end of the 12-month review period, she was calling them "mommy" and "daddy." She did well generally and responded well to the routine and stability they provided.

On July 7, 2020, mother's reunification services were terminated, and a section 366.26 hearing was set.

From July 2020 through September 2020, mother and N.M. had visits over "Zoom." The visits went well; N.M. would color or work on an art project while talking with mother, and they lasted from 30 minutes to an hour. In September 2020, in-person visits resumed. N.M. was excited to see mother and she and mother were affectionate toward one another. Mother brought food and gifts or activities. It was reported mother sometimes confused N.M. by jumping quickly from topic to topic or by laughing at things that a child of N.M.'s age would not understand to be comedic. N.M. enjoyed the visits, but some of her negative behaviors increased once the in-person visits resumed. N.M. started to be easily angered, showed less resiliency, and would break down when things did not go her way. She experienced increased anxiety leading up to visits. One of N.M.'s care providers reported that N.M. previously had talked about future events and vacations she would take with the care providers but stopped talking about the future once the in-person visits resumed; rather, she began talking more about having been removed from mother and wanting to return to mother's care.

In the social worker's section 366.26 report, the social worker stated that N.M. appeared to feel responsible for mother's well-being and wanted to be with mother to ensure mother was okay and had somewhere to live and food to eat. The social worker reported observing N.M. calm down once she was reassured mother had basic necessities. The social worker opined N.M. appeared to have a strong bond with mother but the relationship did not appear to be a parent-child relationship because N.M. was "parentified" toward mother, as mother's instability had caused N.M. to exhibit much anxiety and worry about mother. When the social worker asked N.M. about not returning to mother's care, N.M. became visibly distraught and wept and said she did not want mother to live alone. N.M. expressed a desire to live with her care providers if she could not be returned to mother but wanted to continue seeing mother to know that mother was okay.

The agency's recommendation going into the section 366.26 hearing was that the court terminate parental rights and order adoption as the permanent plan. N.M.'s care providers wished to adopt N.M., and the social worker opined that N.M. was bonded to them.

At the section 366.26 hearing held on November 20, 2020, mother testified she objected to the recommendation of adoption. Mother had been N.M.'s primary care provider before N.M. had been removed from her care and had visited regularly during the proceedings. During visits, she and N.M. played with toys, colored, ate, talked, watched TV, and held each other. N.M. would tell mother about her day and what she had been doing, and mother gave N.M. guidance about problems she would have at school. N.M. got sad at the end of visits, and mother felt it would "tear [N.M.] apart" if their relationship were to be terminated. Mother felt it was in N.M.'s best interest to maintain a relationship with her because they love each other. Mother testified she had learned from services that she has "a problem" and no longer wanted to "drag [N.M.] around everywhere with" her anymore. Mother testified she was participating in parenting classes and had been participating in drug services since she got released from custody. She was also participating in mental health services, had been compliant with her medication for the past two months, and was attending Alcoholics and Narcotics Anonymous meetings online.

Following mother's testimony, mother's counsel argued the beneficial parent-child relationship exception to termination of parental rights applied.

Counsel for the agency argued that though mother and N.M. shared a bond, it was a negative one because it was based on N.M.'s worry for mother's well-being and thus the exception did not apply and N.M. should be freed for adoption.

N.M.'s counsel agreed with the agency's recommendations.

Following argument from the parties, the juvenile court noted that though a strong bond existed between mother and N.M. in the sense that they loved each other, the

5.

relationship did not confer a benefit to N.M. so as to overcome the legislative presumption of adoption. The court noted the behavioral changes in N.M. brought on by not visiting with mother and then resuming visits. The court then explained it was concerning that: "[N.M.] sees her role in this relationship more of not a child to a parent, but maybe … the way a parent looks to her child, that they want their child to be safe, to have food, and the necessities of life provided for them." The court found mother had not proven the benefit N.M. would gain from continuing the relationship with mother outweighed the benefit N.M. would gain from being adopted. The juvenile court terminated parental rights and ordered adoption as the permanent plan.

## DISCUSSION

At a section 366.26 hearing, when the juvenile court finds by clear and convincing evidence the child is adoptable, it is generally required to terminate parental rights and order the child be placed for adoption unless a statutory exception applies. (§ 366.26, subd. (c)(1).) One of the statutory exceptions is the beneficial parent-child relationship exception, which applies when "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

To prove a parent-child relationship constitutes a compelling reason to forgo terminating parental rights, the parent has the burden to establish that "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 574–575.) "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Id.* at p. 575.) However, "[n]o matter how loving and frequent the contact, and notwithstanding the existence of an 'emotional bond' with

6.

the child, 'the parents must show that they occupy "a parental role" in the child's life.' " (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.) Even when a child loves his or her parents and desires continued contact with them, the court may nonetheless terminate parental rights if doing so is in the child's best interests. (§ 366.26, subd. (h)(1); *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 955.) The exception must be examined on a case-by-case basis, and factors the court should consider include the "age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*In re Autumn H.*, at p. 576.)

With regard to the factual findings the juvenile court must make (whether the parent has maintained regular visitation and/or whether a beneficial parental relationship exists), if the court does not find the parent met his or her burden of proving these findings, the question on review is "whether the evidence compels a finding in favor of the parent on this issue as a matter of law." (*In re Breanna S.* (2017) 8 Cal.App.5th 636, 647; see *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) We review a court's determination that the benefit to the child derived from preserving parental rights is not sufficiently compelling to outweigh the benefit achieved by the permanency of adoption for abuse of discretion. (*In re Breanna S.*, at p. 647.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318–319.)[3]

---

[3] The issue of the proper standard of review of a court's determination the beneficial parent-child relationship exception did not apply is currently pending before the California Supreme Court in *In re Caden C.* (2019) 34 Cal.App.5th 87, review granted July 24, 2019, S255839. While appellate courts have articulated different standards of review in this context, there is not much practical difference between the different standards of review. Under any of these standards of review, the practical differences between them are slight because they all give broad deference to the juvenile court's judgment. (See *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.) We should

Here, the juvenile court was not compelled by the evidence to find a beneficial parent-child relationship existed and did not abuse its discretion by concluding termination of parental rights would not be detrimental to N.M. such as to forgo terminating parental rights. We acknowledge, as mother points out, there is evidence on the record that N.M. loved mother, enjoyed spending time with her, got emotional at the end of visits, and consistently expressed a desire to be returned to her. However, this evidence did not compel a finding mother occupied a parental role in N.M.'s life nor that the relationship was a beneficial one in greater context; rather, the totality of the evidence supported contrary findings. The negative emotions N.M. expressed about not being with mother appeared to be almost exclusively tied to worry for mother's well-being, not a desire to be cared for or comforted by her, which would be more characteristic of how a child would relate to a parent. When N.M.'s visits with mother ceased because of mother's incarceration and then were limited because of COVID-19-related precautions, N.M. did not devolve or appear to struggle. To the contrary, by all accounts, she appeared to thrive; she was less focused on worrying about mother, her negative behaviors decreased, and she was able to focus better in school. Once in-person visits recommenced, N.M. resumed displaying anxiety related to mother's well-being. The totality of these circumstances support a reasonable inference that contact with mother had a negative impact on N.M.'s well-being. In addition, the social worker opined termination of parental rights would not be detrimental to N.M., N.M.'s counsel supported the recommendation of termination of parental rights, and mother offered no expert testimony or bonding study that refuted the reasonable inferences that the relationship had a negative effect on N.M.'s life nor established N.M. would suffer great harm from the termination of parental rights.

interfere only if under all the evidence viewed most favorably in support of the juvenile court's action, it finds no judge could reasonably have made the order. (*Ibid.*) We find no error under any standard of review.

Though the juvenile court noted some benefit may have resulted from the relationship because of the love N.M. and mother had for one another, the court did not err by finding any benefit N.M. received from the positive aspects of N.M.'s relationship with mother, given the negative effect the relationship had on other aspects of N.M.'s life, did not outweigh the well-being N.M. would gain from a permanent adoptive home.

We find no error.

## **DISPOSITION**

The juvenile court's November 20, 2020 order terminating parental rights is affirmed.